## THE TERRITORY OF NEW MEXICO, Appellee, v. THOMAS KETCHUM, Appellant.

### SYLLABUS BY THE COURT.

CRIMINAL LAW—CONSTITUTIONAL LAW—UNUSUAL PUNISHMENTS—SECTION 1151, C. L.—Section 1151 of the Compiled laws of 1897, prescribing the death penalty for assault upon a train with intent to commit robbery or other felony, does not prescribe a cruel and unusual punishment within the meaning of the Eighth amendment to the Constitution of the United States.

*Appeal* from judgment of conviction against defendant from District court of Union county. Affirmed.

The facts will appear from the opinion of the court.

WILLIAM B. BUNKER and JOHN R. GUYER, attorneys for appellant.

EDWARD L. BARTLETT, Solicitor-General, and LEWIS C. FORT, Special counsel, for appellee.

PARKER, J.—The appellant was convicted in Union county in the Fourth judicial district under section 1151 of the Compiled Laws of 1897, which is as follows:

"If any person or persons shall willfully and maliciously make any assault upon any railroad train, railroad cars, or railroad locomotive within this Territory, for the purpose and with the intent to commit murder, robbery, or any other felony upon or against any passenger on said train or cars, or upon or against any engineer, conductor, fireman, brakeman, or any officer or employee connected with said locomotive, train or cars, or upon or against any express messenger, or mail agent on said train, or in any of the cars thereof, on conviction thereof shall be deemed guilty of a felony and shall suffer the punishment of death."

Judgment was rendered upon the verdict and the appellant sentenced to death by hanging, as provided by section 1067 of the Compiled Laws of 1897. The case is here on appeal and presents the single question whether the death penalty, as applied to this offense, is a cruel and unusual punishment within the prohibition of the eighth amendment to the Constitution of the United States.

It may be assumed that the death penalty, in a proper case, is not cruel within the prohibition of the Constitution. In re Kemmler, 136 U. S. 436. And it is a matter of common knowledge that it is not unusual, it being employed in nearly all the states, as well as by the United States, as a punishment for crime. But it is contended by counsel for appellant that the death penalty is such an excessive punishment in degree for the offense of which the defendant stands convicted as to be within the prohibition of the Constitution.

CRIMINAL law: constitutional law: unusual punishment. Sec. 1151, C. L.

Much difficulty has been expressed by both courts and text writers in attempting to define the scope of this constitutional provision. Some courts have thought that it was never intended as a limitation upon legislative discretion in determining the severity of punishment to be inflicted, but rather refers to the mode of infliction. Thus in Aldridge v. Com., 2 Va. Cases, 447, 449, it is said:

"That provision was never designed to control the legislative right to determine *ad libitum* upon the adequacy of punishment, but is merely applicable to the modes of punishment."

In Com. v. Hitchings, 5 Gray (Mass.), 482, 486, its said: "The question whether the punishment is too severe and disproportionate to the offense, is for the Legislature to determine."

In Sturtevant v. Com., 158 Mass. 598, it is said: "This article is directed to courts, not to the Legislature."

It may be, however, that the decisions in Massachusetts are based upon the peculiar language of their Constitution, which is: "No magistrate or court of law shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishments."

In State v. Williams, 77 Mo. 310, 312, it is said: "The interdict of the Constitution against the infliction

of cruel and unusual punishments would apply to such punishments as amount to torture, or such as would shock the mind of every man possessed of common feeling, such for instance as drawing and quartering the culprit, burning him at the stake, cutting off his nose, ears or limbs, starving him to death, or such as was inflicted by an act of Parliament as late as the 22 Henry VIII, authorizing one Rouse to be thrown into boiling water and boiled to death for the offense of poisoning the family of the Bishop of Rochester. * * * If under the statute in question (defining and providing punishment for the crime of obtaining money under false pretenses) a punishment by imprisonment for life of one who is convicted of the offense therein defined, should be inflicted, it might well be said that such punishment would be excessive, or rather entirely disproportioned to the magnitude of the offense, yet notwithstanding this, there is high authority for saying that 'the question whether the punishment is too severe and disproportionate to the offense is for the Legislature to determine.' "

In People v. Morris, 80 Mich. 634, 638, it is said: "The difficulty in determining what is meant by 'cruel and unusual punishment,' as used in our Constitution, is apparent. Counsel for defendants claims that, as properly understood, it means, when used in this connection, punishment out of proportion to the offense. If by this is meant the degree of punishment, we do not think the contention correct. When, in England, concessions against cruel and unusual punishments were first wrested from the Crown, slight offenses were visited with the most extreme punishment, and no protest was made against it."

In Garcia v. Territory, 1 N. M. 415, 418, this court said: "The word cruel, as used in the amendatory article of the Constitution, was, no doubt, intended to prohibit a resort to the process of torture, resorted to so many centuries as a means of extorting confessions from suspected criminals under the sanction of the civil law. It was never designed to abridge or limit the selection by the law-making power, of such kind of punishment as was deemed most effective in the punishment and suppression of crime."

This provision of the Constitution was before the Supreme Court of the United States in Wilkerson v.

Utah, 99 U. S. 130. In that case the question was, whether a judgment directing the infliction of the death penalty by shooting was cruel and unusual. The court said: "Difficulty would attend the effort to define with exactness the extent of the constitutional provision, which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to (4 Blk. Com. 377, where the prisoner was drawn or dragged to the place of execution, in treason; where he was embowelled alive, beheaded and quartered, in high treason; cases of public dissection, in murder; and of burning alive, in treason committed by a female), and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." In re Kemmler, 136 U. S. 436, the question was whether the method adopted by the New York statute of inflicting the death penalty, which was by electrocution, was cruel and unusual. The court said: "This declaration of rights (Act of Parliament of 1688, 1 W. & M. c. 2) had reference to the acts of the executive and judicial departments of the Government of England; but the language in question, as used in the Constitution of the State of New York, was intended particularly to operate upon the Legislature of the state, to whose control the punishment of crime was almost wholly confided. So that, if the punishment prescribed for an offense against the laws of the state were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like, it would be the duty of the courts to adjudge such penalties to be within the constitutional prohibition. And we think this equally true of the eighth amendment, in its application to Congress. * * * Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word, as used in the Constitution. It implies there something inhuman, and barbarous, something more than the mere extinguishment of life." It is true that in both of the cases quoted from, the Supreme Court had before them for consideration, not the question of the severity of a punishment, but simply the question of the method of inflicting the death penalty, but in both

those cases, the court limit the meaning of the word cruel, as used in the Constitution, to something which involves torture. If this be the test in all cases, then it must be clear that legislative discretion in determining the severity of punishment for crime is not to be interfered with by the courts, so long as all forms of torture are avoided. In 1 Bish. Cr. Law, Sec. 947, it is said: "Evidently, in reason, the punishments commonly inflicted at the time when the Constitution was adopted, could not be deemed 'unusual,' and no punishment is 'cruel' simply because it is severe, or 'cruel and unusual' because it is disgraceful. But mere torture, however slight, would be within the prohibition." Mr. Tiedeman, in his work on limitations of Police Power, page 21, says: "But would the infliction of capital punishment for offenses, not involving the violation of the right to life and personal security, be such a 'cruel and unusual punishment,' as that it would be held to be forbidden by this constitutional provision. It would seem to me that the imposition of the death penalty for the violation of the revenue laws, i. e., smuggling, or the illicit manufacture of liquors or even for larceny or embezzlement, would properly be considered as prohibited by this provision as being 'cruel and unusual'. But if such a construction prevailed, it would be difficult to determine the limitations to the legislative discretion."

It would, indeed, seem to be a matter of great doubt, in view of the foregoing expressions of opinion on this subject, whether the courts, in any case, have the power to review legislative discretion in determining the severity of punishment for crime so long as all forms of torture have been avoided. Judge Cooley, however, in his work on Constitutional Limitation, draws a distinction which seems not to have been usually recognized. He says: "It is certainly difficult to determine precisely what is meant by cruel and unusual punishments. Probably any punishment declared by statute for an offense which was punishable in the same way at the common law, could not be regarded as cruel or unusual in the constitutional sense. And probably any new statutory offense may be punished to extent and in the mode permitted by the common law for offenses of similar nature. But those degrading

punishments which in any state had become obsolete before its existing constitution was adopted, we think may well be held forbidden by it as cruel and unusual." Cooley's Con. Lim. (3 Ed.) 329. If we understand the language of the learned author a punishment provided by statute for an offense, of a kind, as, for example, death by hanging, or imprisonment, is not prohibited by the constitutional provision if, at common law, a like kind of punishment was authorized for offenses of a similar nature. If this be the test, then it is clear that the penalty prescribed in the case at bar is within the rule laid down, for assault with intent to rob was a felony at common law, or, at least, was made so by Stat. Geo. 2 C. 21; 1 Jacob's Law Dic., title assult. I Hawk. P. C. c. 15, pg. 113; and as such punishable with death unless otherwise provided by statute. I Jacob's Law Dic. title Felony. I Bish Crim. Law. Sec. 935.

It is thought, however, by some of the courts that the constitutional provision under consideration is broad enough to confer upon the court the power to review legislative discretion concerning the adequacy of punishment. Thus in State vs. Becker, 3 So. Dak, 29, 41 it is said: "It is a very noticeable fact that this question has seldom been presented to the courts, and we take this fact to signify that it has been the common understanding of all that courts would not be justified in interfering with the discretion and judgment of the legislature, except in very extreme cases, where the punishment proposed is so severe and out of proportion to the offense as to shock public sentiment and violate the judgment of reasonable people." This doctrine has been recognized in a number of cases some of which we cite. In re MacDonald, 33 Pac. 18. In the Matter of Bayard, 63 How. Prac. Rep. p. 73, 76; Thomas v. Kinkead, 55 Ark. 502. See also State v. Driver, 78 N. C. 423. Also dissenting opinions of Justices Field, Harlan and Brewer in O'Neil v. Vermont, 144 U. S. 323.

While we have arrived at a conclusion that the discretion of the Legislature in determining the adequacy of the punishment for crime is almost, if not quite, unlimited, yet such a conclusion is entirely unnecessary to an affirmance of this judgment. Assuming, for the sake of argument, that the courts may, in extreme cases, review the discre-

tion of the Legislature in determining the severity of punishment, still we see no reason why this statute under consideration should be held to be unconstitutional, by reason of its severity. The act under which the defendant was convicted was passed in 1887 and has been upon the statute books, unchallenged by the people of the Territory, ever since that time. It has evidently met with the approval of the people and has not been deemed by them cruel on account of its severity. It is hardly necessary to recall the incidents attending the ordinary train robbery, which are a matter of common history, to assure every one that the punishment prescribed by this statute is a most salutary provision and eminently suited to the offense which it is designed to meet. Trains are robbed by armed bands of desperate men, determined upon the accomplishment of their purpose, and nothing will prevent the consummation of their design, not even the necessity to take human life. They commence their operations by over-powering the engineer and fireman. They run the train to some suitable locality. They prevent the interference of any person on the train by intimidation or by the use of deadly weapons and go so far as to take human life in so preventing that interference. They prevent any person from leaving the train for the purpose of placing danger signals upon the track to prevent collisions with other trains, thus wilfully and deliberately endangering the life of every passenger on board. If the express messenger or train crew resist their attack upon the cars, they promptly kill them. In this and many other ways they display their utter disregard of human life and property, and show that they are outlaws of the most desperate and dangerous character. In the case at bar, while the record of the testimony is not before us, it is a matter of current history that, while he was the lone robber, the defendant shot the mail clerk through the face and the conductor through the arm and only desisted from his attack upon the train when he was shot through the arm by the conductor. His manner of conducting this business of train robbery was but a sample of what is being done by those engaged in that business in all parts of the

country, except that he undertook the business single handed. It is true that this statute makes an attempt at train robbing the offense for which the death penalty is to be inflicted. It is also true that in this case the offense of the defendant was but an attempt, he having failed to accomplish his purpose. Ordinarily the death penalty for an attempt to commit an act would be a most severe punishment; but, taking into consideration all the circumstances usually attending a train robbery, or an attempted train robbery, we can not say that we deem the death penalty in any degree excessive as compared with the gravity of the offense, if the death penalty is to be inflicted for any violation of the criminal laws.

We conclude, therefore, that the statute in question is not in violation of the eighth amendment to the Constitution of the United States, and, there being no error in the record, the judgment of the lower court will be affirmed and the judgment and sentence of the district court shall be executed on Friday, March 22, A. D. 1901, and it is so ordered.

Crumpacker, McFie and McMillan, JJ., concur; Mills, C. J., did not sit, he having tried the case below.

---

[901. February 25, 1901.]