552 P.2d 787

**STATE of New Mexico ex rel. E. C. SERNA, District Attorney for the Sixth Judicial District, State of New Mexico, Petitioner,**

v.

**Hon. Norman HODGES, District Judge of the Sixth Judicial District, State of New Mexico, Respondent.**

Nos. 10187, 10194.

Supreme Court of New Mexico.

June 29, 1976.

See also 89 N.M. ——, —— P.2d ——.

**352**

E. C. Serna, Dist. Atty., Patricio S. San-chez, Asst. Dist. Atty., Silver City, Toney Anaya, Atty. Gen., F. Scott MacGillivray, Asst. Atty. Gen., Santa Fe, for petitioner.

Sherman & Sherman, Paul F. Sherman, Deming, Glenn B. Neumeyer, Las Cruces, for respondent.

OPINION

STEPHENSON, Justice.

These consolidated cases raise the question whether the New Mexico death penalty statute, § 40A–29–2, N.M.S.A.1953 (Supp.1975)[1] is unconstitutional under the eighth or fourteenth amendments to the Constitution of the United States or under Article II, § 13 or 18 of the Constitution of New Mexico.

On September 11, 1974, the respondent, in *State v. Edington,* Criminal No. 1086 (Sixth Judicial Dist., Hidalgo County, N. M.),[2] held by memorandum opinion that "Section 40A–29–2 is unconstitutional under the decision of *Furman v. Georgia,*"[3] that the law prior to 1973[4] would apply[5] and that, therefore, the maximum penalty if Edington were convicted of first degree murder would be life imprisonment.[6] Sub-

---

1. § 40A–29–2, N.M.S.A.1953 (Supp.1975) provides: "When a defendant has been convicted of a capital felony the judge shall sentence that person to death * * *."

2. The real party in interest in No. 10187, Birt R. Edington, was charged with first degree murder and arraigned on June 28, 1974. On July 10, 1974, Edington filed a motion to dismiss alleging, inter alia, that the death penalty was unconstitutional. Denying the motion, Judge Hodges nevertheless agreed that the death penalty was unconstitutional and entered a pretrial order holding the maximum penalty to be life imprisonment under New Mexico law.

3. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

4. Section 40A–29–2 was enacted in 1973 by ch. 109, § 2 [1973] N.M.Laws 342. Before 1973 the following statutes were in effect:
   40A–29–2. Sentencing authority—Capital felonies.—When a defendant has been convicted of a capital felony the judge shall sentence that person to death, unless the jury trying such case shall recommend life imprisonment, then the judge shall sentence that person to life imprisonment; provided that in cases wherein the defendant has entered a plea of guilty to the commission of a capital felony, the court may in lieu of sentencing such person to death, sentence the defendant to life imprisonment.
   40A–29–2.1. Capital punishment limited.—Punishment by death for any crime is abol-

ished except for the crime of killing a police officer or prison or jail guard while in the performance of his duties and except if the jury recommends the death penalty when the defendant commits a second capital felony after time for due deliberation following commission of a capital felony.
   40A–29–2.2. Maximum punishment.—All crimes for which capital punishment is abolished by section 1 [40A–29–2.1] are punishable by a penalty of life imprisonment in the state penitentiary.
   40A–29–2.3. Persons previously sentenced to death.—Any person currently under penalty of death shall have such penalty revoked, and a penalty of life imprisonment substituted.

5. Ch. 109, § 3, [1973] N.M.Laws 342–43 repealed §§ 40A–29–2.1 through 2.3, supra note 4. Citing 16 Am.Jur.2d Constitutional Law § 185 (1964), respondent in his opinion applied the familiar rule for a case in which statutes containing repeal clauses have been held to be unconstitutional, that "the clause containing the repeal is incidental to the rest of the statute, and that if the latter is invalid, the clause containing the repeal will likewise be deemed invalid, leaving the prior general law unrepealed."

6. In none of these cases are the defendants charged with murdering a police officer or a prison or jail guard or with a second capital felony. See § 40A–29–2.1, supra note 4.

sequently, the petitioner was informed by respondent that the Edington decision would also apply in *State v. Sierra,* Criminal No. 11912 (Sixth Judicial Dist., Grant County, N.M.)[7] and in *State v. Apodaca,* Criminal No. 2929 (Sixth Judicial Dist., Luna County, N.M.).[8]

■ Pursuant to Article VI, § 3 of the New Mexico Constitution and Rule 12 of the Rules Governing Appeals,[9] petitioner successfully sought alternative writs of prohibition to preclude respondent from proceeding in the *Edington, Sierra* and *Apodaca* cases and now seeks to have the writs of prohibition made permanent by the exercise of this court's power of superintending control. See *State v. Zinn,* 80 N.M. 710, 460 P.2d 240 (1969).[10] Petitioner alleges there is a conflict in the New Mexico judicial districts as to whether or not the death penalty as written by the Legislature in 1973 is constitutional, that several persons in other judicial districts have been convicted of first degree murder and sentenced to death, and that allowing the ruling of respondent to stand will result in the rendering of unequal justice in New Mexico unless the question of the constitutionality of the death penalty is resolved prior to the trial of these cases.

The defendant Edington (we will refer to the real parties in interest as "defendants") and the Public Defender Department in its amicus brief argue that prohibition will not lie in these cases, or that we should not in our discretion make the alternative writs permanent or exercise our powers of superintending control.[11] We do not agree. Because of the great public interest involved and the importance of this question to the criminal justice system, we deem it imperative to decide the issue presented here. See *State v. Scarborough,* 75 N.M. 702, 410 P.2d 732 (1966); cf. *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974). We hold that the alternative writs of prohibition were not improvidently issued, and will consider whether the writs should be made permanent on the merits.

■ The defendants also argue that the death penalty statute, as enacted, is unconstitutional, violating Article IV, §§ 16[12] and 18[13] of the New Mexico Constitution. This court has meanwhile held that such is not the case. *State v. Trivitt,* N.M., 548 P.2d 442 (1976).

We are confronted only with the following issues of substance:

A. Does the death penalty, in and of itself, amount to cruel and unusual

---

7. The real party in interest in No. 10194, Samuel C. Sierra, was charged with an "open" charge of murder and arraigned on May 13, 1974. On October 15, 1974, respondent entered an order holding the maximum penalty for first degree murder to be life imprisonment and not death and that the case would be tried as such.

8. The real party in interest in No. 10209, Wash G. Apodaca, was charged with first degree murder and arraigned on July 9, 1974. On October 25, 1974, respondent entered an order similar to that in *State v. Sierra.* On May 5, 1976, we remanded No. 10209 to district court which entered an order dismissing the information. The writ of prohibition was subsequently quashed on May 13, 1976.

9. § 21–12–12, N.M.S.A.1953 (Supp.1975).

10. In *Zinn,* it was recognized that the issuance of a writ of prohibition under the power of superintending control is a matter of sound judicial discretion to be utilized, in a case such as this, if the inferior court's order "is erroneous, arbitrary, and tyrannical, or would be gross injustice, or might result in irreparable injury, and there is no plain, speedy, and adequate remedy unless it is issued * * *." 80 N.M. at 712, 460 P.2d at 242. See also *State ex rel. Harvey v. Medler, District Judge,* 19 N.M. 252, 142 P. 376 (1914).

11. N.M.Const. art. VI, § 3.

12. "The subject of every bill shall be clearly expressed in its title, and no bill embracing more than one subject shall be passed except general appropriation bills and bills for the codification or revision of the laws; but if any subject is embraced in any act which is not expressed in its title, only so much of the act as is not so expressed shall be void. . . ."

13. "No law shall be revised or amended, or the provisions thereof extended by reference to its title only; but each section thereof as revised, amended or extended shall be set out in full. * * *"

punishment within the prohibition of:

(1) The eighth amendment to the Constitution of the United States;[14] or

(2) Article II, § 13 of the New Mexico Constitution;[15] or

(3) Both?

If any of the foregoing queries are answered in the affirmative, we need go no further. If we reach negative answers, we must consider:

B. Do procedures imposing the death penalty provided by § 40A-29-2 offend these constitutional provisions?

We first consider whether capital punishment constitutes cruel and unusual punishment within the proscription of the eighth amendment to the United States Constitution. It obviously does not for a variety of reasons. Certainly nothing said within the four corners of the document prohibits it. Capital punishment was in use in England and the Colonies under sanction of law at the time of adoption of the United States Constitution. This has been stated and its significance discussed so frequently that we decline to add to the literature on the subject.

The United States Constitution authorizes, or clearly contemplates, the imposition of the death penalty. The fifth amendment is a notable example. It provides in its opening sentence that "[n]o person shall be held to answer for a *capital* * * * crime, unless on a presentment or indictment of a Grand Jury, * * *." (emphasis added). Thus, one may be held to answer for a capital offense upon a presentment or indictment. Similarly, the double jeopardy clause of that amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy *of life* * * *." (emphasis added). The clear implication of this is that a person may once be put in jeopardy of life for an offense. Even more obvious are the due process clauses of the fifth and fourteenth amendments. If the federal and state governments are precluded from depriving any person of life without due process of law, then it logically follows that any person may be deprived of life with due process of law. These examples illustrate the simple truth that the imposition of the death penalty is contemplated by the United States Constitution.

Moreover, no court whose decision is binding upon us has ever held that capital punishment is per se cruel and unusual. "Cruel" as used in the eighth amendment has been said to prohibit punishments which inflict unnecessary pain or cruelty, torture, or lingering death. The punishment must be inhuman or barbarous to fall within the prohibition. In re *Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Wilkerson v. Utah,* 99 U.S. 130, 25 L.Ed. 345 (1879). The framers of the amendment were basically concerned with torture.[16]

As to the meaning of "unusual," the cases are not so clear. Most courts have considered the entire phrase, "cruel and unusual," without discussion of the word "unusual." See, e. g., *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); *O'Neil v. Vermont,* 144 U.S. 323, 339-40, 125 S.Ct. 693, 36 L.Ed. 450 (1892) (dissenting opinion); *Wilkerson v. Utah,* supra. We are unwilling to believe that the phrase simply uses two words where one would do. Probably it would be held to preclude the imposition of some form of punishment which was unknown to the his-

---

14. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

15. "All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor ex-

cessive fines imposed, nor cruel and unusual punishments inflicted."

16. See *Furman v. Georgia,* 408 U.S. 238, 377, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, J., dissenting), citing 2 J. Elliot's Debates 111 (2d ed. 1876); 3 id. at 447-448, 451-452.

tory of the law, or at least rare in modern times—e. g., a punishment devised by him who would impose it and not sanctioned by law.

We need not attempt to define the constitutional parameters of the word "unusual." The United States Supreme Court has not done so, but has rather considered the phrase of which the word is a part on a case-by-case basis. *Weems v. United States,* supra; *O'Neil v. Vermont,* supra; *Wilkerson v. Utah,* supra. No such definition is necessary to a resolution of the issues here.

■ If the constitutional definition of "unusual" is troublesome, certain features of the word and its use are clear. It does not appear to either enlarge or restrict the word "cruel." From its context in the document and in history, it rather clearly refers to the nature of the punishment under consideration rather than to the infrequency of its imposition.[17] This is the meaning which we attribute to the word as used not only in the eighth amendment but also in Article II, § 13 of the New Mexico Constitution.

Finally, we observe cases in which the United States Supreme Court has directly or implicitly held that capital punishment is not per se cruel and unusual. *In re Kemmler,* supra (dictum); *Wilkerson v. Utah,* supra; *Francis v. Resweber,* 329 U. S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947). In *Trop v. Dulles,* supra note 17, Chief Justice Warren speaking for four of the court said:

Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty.

356 U.S. at 99, 78 S.Ct. at 597.

Some mention must be made of *Furman v. Georgia,* supra.[18] The opinions demonstrate that only two[19] of nine justices believed that capital punishment was prohibited by the eighth amendment for all crimes and in all situations. The remaining three justices[20] who joined in the majority opinion predicated their result upon shortcomings of the practices and procedures by which the death penalty had been imposed in the three consolidated cases under consideration. Although their reasoning would seem to lead them toward a holding that under the facts of those cases there was a violation of the due process clause, they nevertheless said that their ruling was predicated on the eighth amendment.[21] However, it is perfectly clear that they were concerned with practice and procedure.

The significance of *Furman* in the area under discussion is that the opinions of Justices Brennan and Marshall gather together most of the arguments normally advanced in the attack on capital punishment as being per se cruel and unusual. The briefs which are before us, in the main, focus on the content of those two opinions.

The *Brennan* and *Marshall* opinions dwell upon capital punishment's supposed lack of deterrent effect. Although such

17. In his plurality opinion in *Trop v. Dulles,* 356 U.S. 86, 100–101 n. 32, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958), Chief Justice Warren said, "If the word 'unusual' is to have any meaning apart from the word 'cruel,' however, the meaning should be the ordinary one, signifying something different from that which is generally done." We agree.

18. The only statement that five justices could agree upon was that "the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S. at 239–40, 92 S.Ct. at 2727. This is not much guidance for the future application of *Furman.*

19. Justice Brennan (408 U.S. at 257–306, 92 S.Ct. 2726) and Justice Marshall (408 U.S. at 314–74, 92 S.Ct. 2726).

20. Justices White, (408 U.S. at 310–14, 92 S.Ct. 2726) ; Stewart, (408 U.S. at 306–10, 92 S.Ct. 2726) ; and Douglas, (408 U.S. at 240–57, 92 S.Ct. 2726).

21. See discussion of *Commonwealth v. O'Neal,* infra.

matters are rather obviously for state legislative decision, the defendants would seemingly have us find as a fact that capital punishment is not an effective deterrent as a predicate for holding it cruel and unusual. This we decline to do. The deterrent effect of capital punishment is not subject to empirical measurement. How can the number of murders that were not committed because of a fear of execution be known?

The theory that capital punishment does not deter murder is but a facet of a larger argument that punishment does not deter crime. We are not persuaded that such is the case. The idea runs counter to the ancient wisdom of mankind and its common experience.

The *Brennan* opinion argues that a punishment is cruel and unusual if it does not comport with human "dignity." This concept is the subject of elaborate argument in the briefs, extending even to graphic and detailed descriptions of the physical reactions and facial expressions of persons being executed. The briefs contain no description of the reactions and expressions of the victims. It may be conceded that being executed, in common with other ordeals and vicissitudes, is essentially undignified. So, we suppose, is being murdered.

The prime thrust of the *Marshall* opinion asserts that capital punishment "is morally unacceptable to the people of the United States at this time in their history." 408 U.S. at 360, 92 S.Ct. at 2788. In the short lapse of time since *Furman* was handed down, not less than thirty-five states and the federal government have replaced or modified their statutes regarding the procedures by which the sentence of death is imposed.[22] This massive legisla-

tive endeavor was a concerted effort to comply with *Furman*, to the end that capital punishment could be constitutionally imposed.

Moreover, "the people" have expressed themselves even more directly by referendum or initiative on three occasions, following the decision in *Furman*.[23] In each case the vote favored capital punishment by a wide margin.[24] Is any institution of government more closely attuned to the people's morals than the people?

■ Guided by decisions of the United States Supreme Court, we hold that the death penalty is not, per se, cruel and unusual punishment within the proscription of the eighth amendment to the Constitution of the United States.

■ We now consider Article II, § 13 of the New Mexico Constitution. We do so as the ultimate arbiters of the law of New Mexico. We are not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution, even in construing provisions having wording that is identical, or substantially so, "unless such interpretations purport to restrict the liberties guaranteed the entire citizenry under the federal charter." *People v. Brisendine*, 13 Cal.3d 528, 548, 119 Cal.Rptr. 315, 328, 531 P.2d 1099, 1112 (1975).

The Kearny Bill of Rights of 1846 in its 7th Article provided "[t]he accused cannot be compelled to give evidence against himself, or be deprived of life, liberty, or property but by a verdict of a jury and the laws of the land." In the Kearny Code, Crimes and Punishments, Article 1, § 1, also promugated in 1846, it provided that

---

22. See 44 L.W. 3553 (1976). The federal statute is limited to aircraft piracy. 49 U.S.C. § 1472(i), (n) (Supp. IV, 1974).

23. California (November 7, 1972), Colorado (November 5, 1974) and Washington (November 4, 1975). The California vote amended the state constitution following an opinion by the California Supreme Court outlawing capital punishment. The Colorado citizens ap-

proved a death penalty statute passed by their legislature. The Washington Legislature eliminated the death penalty, and the citizens reinstated it by initiative.

24. California [5,447,165 to 2,617,514 (67.5%–32.5%)], Colorado [451, 403 to 286, 805 (61.2%–38.8%)] and Washington [662,535 to 296,257 (69.1%–30.9%)].

"[i]f any person shall be convicted of the crime of willful murder, such person shall suffer death. * * *" The Organic Act establishing the Territory of New Mexico in 1850 provided in § 19 that "[n]o citizen of the United States shall be deprived of his life, liberty or property, in said territory, except by the judgment of his peers and the laws of the land." In Article II, § 18 of the New Mexico Constitution the same thought is expressed in the following language: "No person shall be deprived of life, liberty or property without due process of law * * *."

It is evident that the framers of the laws governing the Territory and the framers of the New Mexico Constitution contemplated that the death penalty might or could be imposed as a penalty for certain specified offenses. The reasonable and ordinary meaning of these quotations makes it clear that under certain circumstances a citizen's life may be forfeited pursuant to due process of law and all other constitutionally guaranteed rights.

This court has handed down two opinions on the subject which are worthy of mention. The issue was before us in *Territory v. Ketchum*, 10 N.M. 718, 65 P. 169 (1901). That case considered whether the death penalty imposed for train robbery was cruel and unusual punishment within the prohibition of the eighth amendment to the Constitution of the United States. The court extensively analyzed *Wilkerson v. Utah*, supra, and concluded that legislative discretion in determining the severity of the punishment would not be interfered with so long as torture was avoided, and that it was doubtful that the court had the power to review such legislative discretion.

Finally, we mention *State v. Pace*, 80 N.M. 364, 456 P.2d 197 (1969). Again the issue was squarely raised as to whether the death penalty, by whatever means death is brought about, should be declared to be contrary to the eighth amendment. The court cited *Territory v. Ketchum*, supra, and said that since that time nothing had transpired which required the court to depart from that holding, and

> [i]f the law is to be changed, it is for the legislature to do it—not us. (citation omitted). We are not heedless of the plea that this is a more enlighted day than were those of years gone by, and that views of what is and what is not right have changed with the passage of time. However, *we perceive our responsibility as being confined to interpreting the law as we understand it, not to making of new law to satisfy our conceptions of right or wrong.* (emphasis added).

80 N.M. at 371, 456 P.2d at 204.

█ We join in those views and hold that capital punishment is not per se "cruel and unusual" within the proscription of Article II, § 13 of the Constitution of New Mexico, and turn to a consideration of the practice and procedure by which the death penalty is provided to be imposed under our statute.

In their argument on this issue the defendants and those aligned with them, building upon *Furman*, by analogy seek to extend it to areas not dealt with in that case. In attempting to isolate the single grievance common to the majority opinions in *Furman*, we agree with Chief Justice Burger, who summarized it in his dissent:

> The decisive grievance of the [concurring opinions] * * * is that the present system of discretionary sentencing in capital cases has failed to produce evenhanded justice * * *.

408 U.S. at 398–99, 92 S.Ct. at 2808.

The defendants say that *Furman* renders unconstitutional every death sentence imposed pursuant to procedures which allow selectivity to determine whether a defendant will live or die for a purportedly capital crime, and that discretionary death penalties are unconstitutional. They say that *Furman* means that *any* arbitrary imposition of capital punishment offends the eighth amendment, whatever the source. From this premise, they urge that al-

though § 40A–29–2 ostensibly makes death the only punishment for a capital crime, nevertheless its implementation requires the exercise of a broad range of uncontrolled selective discretion by district attorneys, trial judges, juries and the governor in choosing which defendants will live and which will die in cases where the death penalty is potentially applicable. They say the cumulative effect of these considerations is to produce an extreme uncertainty and unpredictability in capital sentencing that falls within *Furman's* ban.

More specifically, they point out that prosecuting officials have areas of discretionary determination as to whether a charge will be filed, how it will be initiated and what crime will be charged. They conclude that this prosecutorial discretion makes hollow the claim that New Mexico's death penalty is mandatory. Similarly, as to plea bargaining they urge that in New Mexico the district attorney has unfettered power to accept a plea of guilty to a lesser or other offense from a capitally charged defendant, and that this power effectively undercuts the mandatory nature of the statute, resulting in the arbitrary selectivity condemned in *Furman*.

Furthermore, they argue that a trial jury has essentially uncontrollable power to spare the life of a capital defendant by convicting of a lesser offense or acquitting him notwithstanding overwhelming evidence. From this they reason that a jury has de facto sentencing discretion in homicide cases.

Finally it is urged that the pardoning power in the governor created by Article V, § 6 of the New Mexico Constitution is an unfettered power to spare the lives of condemned defendants, unrestricted by any requirement to act consistently in like cases and with no review of clemency decisions for arbitrariness. It is said that the inevitable result of this system is that a randomly selected number of those convicted of like crimes will be spared execution, and that an uncontrolled power of commutation in the hands of a single official is arbitrary and will result in the death of a capriciously selected handful of defendants.

The defendants do not claim that they have been treated selectively or that any official has been arbitrary and capricious in their cases. They argue, in a generalized way, that the threat exists. These contentions strike at the structure of our criminal justice system. For if it is deficient in capital cases for the reasons advanced by the defendants, it is similarly deficient in all criminal cases in which punishment or sanctions may be imposed.

The framers of our constitutions necessarily contemplated that the ancient rights imbedded in the documents would be implemented by persons who would conscientiously perform their duties in a reasonable way. How else could any department or institution of government function? The result has been a system which was not created simply to secure convictions or impose punishments. Its chief objectives are to obtain justice and grant mercy where merited, by an exercise of judgment, discretion and conscience by a succession of persons or groups with differing skills, backgrounds and viewpoints.

The defendants label as "arbitrary and capricious" each exercise of judgment, professional skill, discretion or mercy which can affect the final sentence. Each occasion in which these processes of cerebration, hitherto thought admirable, are permitted to operate is suspect. They would have us hold that only perfection statisfies the constitution in capital cases. And if this be so in capital cases, it must be true in all other cases. Thus, if we accept that in any enterprise administered by humans, perfection will not be achieved, the defendants' proposition by simple logical progression brings us to the result that no person can be punished for any crime in a system managed by human beings.

Having in mind that the United States Supreme Court's action in *Furman* was directed solely at discretionary sentencing, we are not persuaded that the eighth

amendment requires us to extend the supposed rationale of that case into the areas of charging, plea bargaining, jury verdicts and pardons merely because a possibility of selectivity exists.

As we have said, a number of states amended their statutes relating to the imposition of the death penalty, and several techniques have been used. These acts represent an attempt by the legislatures of the various states to permit the imposition of the death penalty in conformance with *Furman.* One type of statute imposes death for all convictions of a certain crime like first degree murder.[25] New Mexico's statute is of this type.[26] It proceeds upon the theory that no discretion whatever is left concerning the determination of the sentence. Other states have provided mandatory death sentences only for certain specified acts, which are elements of the crime, such as the killing of a prison guard, etc.[27] A third group of states permits the imposition of a death sentence only after a finding of a specific fact after conviction, such as the killing of another for remuneration.[28] These statutes are essentially identical to the second type. Finally, some states require consideration of aggravating circumstances, mitigating circumstances, or both.[29]

Several state appellate courts of last resort have considered the constitutionality of their statutes and with surprising unanimity, except for a Massachusetts case,[30] have concluded that their statutes measured by *Furman,* do not offend the eighth amendment to the United States Constitution and similar state constitutional provisions. We are particularly impressed with the opinion of Justice Lake of the Supreme

Court of North Carolina upholding the constitutionality of the North Carolina mandatory death sentence statute, which is similar to ours. See *State v. Jarrette,* 284 N.C. 625, 202 S.E.2d 721 (1974). The same conclusion was reached as to statutes imposing mandatory death sentences for specific enumerated crimes in *State v. Sheppard,* 331 A.2d 142 (Dela.1974), *State v. Hill,* 297 So.2d 660 (La.1974), cert. denied, 419 U.S. 1090, 95 S.Ct. 682, 42 L.Ed.2d 683 (1975), *Williams v. State,* 542 P.2d 554 (Okla.Crim.App.1975), and *Jefferson v. Commonwealth,* 214 Va. 747, 204 S.E.2d 258 (1974). A statute requiring a finding of fact after conviction was upheld in *Jurek v. State,* 522 S.W.2d 934 (Tex.Crim. App.1975), cert. granted, 423 U.S. 1082, 96 S.Ct. 1090, 47 L.Ed.2d 93 (1976). State courts have also reached the same result as to statutes which require taking into account aggravating circumstances or both aggravating and mitigating circumstances prior to the imposition of a sentence. *State v. Dixon,* 283 So.2d 1 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974); *Coley v. State,* 231 Ga. 829, 204 S.E.2d 612 (1974).

Except for the Massachusetts case, only the Illinois Supreme Court has held such a statute unconstitutional. In *People ex rel. Rice v. Cunningham,* 61 Ill.2d 353, 336 N. E.2d 1 (1975) a statute which took into account aggravating circumstances prior to the imposition of the death penalty was struck down as being unconstitutional. However, the vice in that statute was that the method of sentence review by a three-judge panel offended the state constitutional provision that an appeal of a death sentence must be taken directly to the Su-

---

25. See, e. g., § 40A–29–2 N.M.S.A.1953 (Supp.1975) and N.C.Gen.Stat. § 14–17 (Cumm.Supp.1975).

26. See 40A–29–2, supra note 1.

27. See, e. g., La.Rev.Stat.Ann. § 14:30 (Supp. 1975) and N.H.Rev.Stat.Ann. § 630:1 (Repl. 1974).

28. See, e. g., 49 U.S.C. § 1472(i), (n) (Supp. IV, 1974) and Tex.Penal Code § 19.03 (Supp. 1974).

29. See, e. g., Fla.Stat.Ann. §§ 782.04, 794.11, 921.141 (Cumm.Supp.1975) and Ga.Code Ann. §§ 26–3102, 27–2528, 27–2534.1 (Supp.1975).

30. See discussion of *Commonwealth v. O'Neal,* infra.

preme Court of Illinois. We have no such intermediate appellate review in our statute.

Some of the briefs mention, in passing, an asserted deprivation of fourteenth amendment due process rights. We do not consider this an issue of substance, but observe that after the briefs were filed, opinions were handed down by the Supreme Judicial Court of Massachusetts in which a majority actually held that mandatory capital punishment was a deprivation of due process. *Commonwealth v. O'Neal*, 339 N.E.2d 676 (Mass.1975). In that rather curious case the court had previously affirmed the defendant's conviction for rape-murder and declined to hold the penalty statute unconstitutional on several theories. *Commonwealth v. O'Neal*, 327 N.E.2d 662 (Mass.1975). The court then directed the filing of briefs on the issue of whether a compelling state interest was served by imposition of the death penalty in rape-murder cases. At this juncture, the case seems to have metamorphosed into a factfinding procedure without, so far as appears from the opinion, the introduction of evidence. The majority, while adopting a stance against rape-murder, reasoned that the State had the burden of demonstrating a compelling state interest in imposing capital punishment in such cases and apparently found as a fact that some other punishment would serve as well.

So far as we know the case stands alone. None of the *Furman* opinions adopt this position. We believe the issue must be resolved by construction of the eighth amendment, made applicable to the states by the fourteenth, and the parallel state constitutional provision. If the mentioned rationale were correct, any criminal sanction could be similarly attacked. The State would be burdened with demonstrating a compelling state interest in each, with the court sitting as a super-legislature weighing the wisdom of legislative enactments. We are persuaded that the dissent of Justice Reardon in *O'Neal* correctly states the law. 339 N.E.2d at 698.

 Therefore, we hold that § 40A–29–2, N.M.S.A.1953 (Supp.1975)˙ is not unconstitutional by offending the eighth amendment of the United States Constitution or Article II, § 13 of the Constitution of New Mexico.

The alternative writs of prohibition issued in *State v. Edington*, No. 10187 and *State v. Sierra*, No. 10194 are made permanent.

IT IS SO ORDERED.

OMAN, C. J., and McMANUS and MONTOYA, JJ., concur.

SOSA, J., not participating.